UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------- X

ROBERT J. TROELLER, as President of Local 891, et al.,

                Plaintiffs,

-against-

SAL ALLADEEN, as President of Local 74, et al.,

                Defendants.

----------------------------------------------------------- X

**MEMORANDUM DECISION AND ORDER**

07 Civ. 0965 (BMC)(MDG)

**COGAN, District Judge.**

Plaintiffs Patrick Gannon and his union, Local 891, commenced this action as a special proceeding in state court against defendant Local 32BJ, seeking to vacate an arbitration award (the "Award") that determined the rate of pay of one of Gannon's employees, Larry Thomas, under a collective bargaining agreement ("CBA"). Thomas is a member of defendant Local 32BJ. Plaintiffs contend that the Arbitrator exceeded his authority by relying on a provision within the CBA that was not at issue.

Local 32BJ removed the action to this Court and cross-moved to confirm the Award. I find that the Award constituted a plausible interpretation of the CBA, and therefore I deny plaintiff's motion, grant defendant's motion, and confirm the Award.

## BACKGROUND

It takes two levels of workers to keep the New York City schools clean and properly maintained. Under the "Indirect System of Custodial Care" that has governed since 1898, the Department of Education ("DOE") hires "custodian engineers," who are

each responsible for an individual school, and pays each custodian engineer an allotment for his school. Those custodian engineers, like plaintiff Gannon here, are represented by Local 891. Custodian engineers hire their own employees for their school; these employees are known as "custodian workers," such as Larry Thomas, who are paid from the custodian engineer's DOE allotment. The custodian workers' employer of record is thus their custodian engineer, not the DOE. The custodian workers are now represented by Local 32BJ; until recently, including at the time of the arbitration that is the subject of this action, they were represented by another union, Local 74.

Local 891, as the employer (custodian engineer) representative, and Local 74, as the employee (custodian worker) representative were parties to the CBA at issue here. Like most CBAs, it set out the terms and conditions of employment, grievance procedures, and methods for calculating pay for custodian workers. Local 32BJ has succeeded to Local 74's interest in that agreement.

Thomas' problem started in May, 2005, when Gannon fired him for reasons not disclosed in the record. Thomas' union at the time, Local 74, filed a grievance concerning the firing. Two weeks later, for reasons having nothing to do with his termination, Thomas was arrested.

The DOE maintains a list of individuals that it considers ineligible to work in its schools. That list includes arrestees like Thomas, apparently for the sensible reason of not having people charged with crimes around school children. When the DOE puts a custodian worker on the ineligible list, it notifies the custodian engineer, and refuses to include that worker's pay in the allotment to the custodian engineer. This means that any pay to such worker would have to come directly out of the custodian engineer's pocket.

The custodian engineer will therefore either suspend without pay or terminate the ineligible custodian worker. Thomas went on the list upon his arrest.

In December 2005, the criminal charges against Thomas were dismissed, and he was removed from the ineligible list. Local 891 and Local 74 continued their negotiations over Thomas' termination grievance, and agreed that Thomas would return to work on January 6, 2006, with a 5-day suspension and no back pay. This meant that Thomas worked no hours and received no pay from May 31, 2005 through January 6, 2006.

The time period is significant because the CBA contains an appendix specifying what is entitled the "New Hire Rate." The absence of recognized seniority means that the "New Hire Rate" is lower than the rate at which Thomas was being paid before his termination. The provision is contained in Schedule A to the CBA, and states as follows:

> [T]he hiring rate for all employees ... with the exception of fireperson, who have not worked any hours during [the] previous six month period shall be 15% lower than the incumbent rate, after two years of service at the reduced rate, employees shall earn the incumbent rate.

Based on this provision, Gannon paid Thomas 15% less than he had been making before he was terminated.

Local 74 filed a grievance against Local 891, asserting that Thomas was not a "new hire," and the matter went to arbitration. It appears to be the usual practice that in such arbitrations, the parties will agree upon a statement of the issue for the arbitrator, but they were unable to do so here; they therefore left it to the Arbitrator to frame the issue. The Arbitrator heard from one witness for each side. From the description of the testimony by Local 891, it appears that each witness offered largely opinion testimony

about what the "New Hire Rate" provision was supposed to mean. Both sides, according to Local 891, argued their positions based solely upon what they thought the provision should mean standing alone, without reference to any other portion of the CBA.

On November 8, 2006, the Arbitrator issued a reasoned Award. It is clear that his approach differed from what Local 891 describes both parties as having expected. He framed the issue as:

> Did the Employer violate the Collective Bargaining Agreement by (a) declaring Larry Thomas to be a new hire subsequent to his removal from the DOE Ineligible List and January 6, 2006 reemployment, (b) paying Larry Thomas the new hire rate of pay subsequent to January 6, 2006, and (c) regarding Larry Thomas to be an employee who incurred a break in service for more than thirty (30) days?

According to Local 891 (and Local 32BJ does not dispute it for purposes of this motion), the "break in service" language to which the Arbitrator referred had not been argued by either party. It came from Article 25(b) of the CBA, upon which the Arbitrator relied for his decision. Indeed, the Arbitrator stated that "[t]his case involves the application and interpretation of Article 25, Section (b) which was added to the Collective Bargaining Agreement during the negotiations resulting in the current Collective [B]argaining Agreement." Article 25(b), entitled "Seniority," states:

> In order to accrue benefits which are based on length of service, an employee must be employed with substantial continuity. Any employee who has incurred a break in service for more than thirty (30) consecutive calendar days and subsequently obtains another job as a custodial worker, shall be deemed a new employee for all purposes.
>
> If an employee is discharged or quits his employment, the thirty (30) days shall begin to run from the day following the last day worked.
>
> Any employee who has been laid off pursuant to Section 26. [*sic*] of the collective bargaining agreement and recalled within six (6) months, shall not suffer a break in service.

4

From his Award, it is clear that the Arbitrator viewed the proper construction of "break in service" as dispositive of the issue as to whether Thomas became a "new hire" when he returned to work. The Arbitrator distinguished Thomas' situation from that of an employee who resigned, or whose termination was sustained after a grievance, and then was rehired. He noted by analogy that under federal civil rights laws, including the Family and Medical Leave Act ("FMLA") and the Uniformed Servicemembers Employment and Reemployment Rights Act ("USERRA"), involuntary separations do not negatively affect pay or seniority rights. Because Thomas had neither taken voluntary action to break his service, nor was his termination sustained, nor had he done anything for which he could be held responsible to end up on the ineligible list (the criminal charges against him having been dropped), the Arbitrator concluded: "In returning Grievant to work after such a dismissal of criminal charges, the return to employment is as if the hiatus never occurred. Grievant's seniority is then bridged; he is not a new hire; he is not to be paid the new hire rate."

## DISCUSSION

District courts may treat a petition to confirm or vacate an arbitration award as a motion for summary judgment. D.H. Blair & Co., Inc. v. Gottdiener, 462 F.3d 95, 110 (2d Cir. 2006) ("the removed New York Petition was in substance a motion"). Review of an arbitration award most frequently presents an issue of law and "the confirmation of an arbitration award is a summary proceeding that merely makes what is already a final arbitration award a judgment of the court." Florasynth, Inc. v. Pickholz, 750 F.2d 171, 176 (2d Cir. 1984).

"It is well established that courts must grant an arbitration panel's decision great deference. A party petitioning a federal court to vacate an arbitral award bears the heavy burden of showing that the award falls within a very narrow set of circumstances delineated by statute and case law." Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S, 333 F.3d 383, 388 (2d Cir. 2003). A court "play[s] only a limited role when asked to review the decision of an arbitrator" and will not vacate an arbitration award merely because the arbitrator has made an error in reasoning. United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc., 484 U.S. 29, 36 (1987). Arbitrators are given substantial discretion, even when the court disagrees with the arbitrator's interpretation. In fact, an arbitration award "should be enforced, despite a court's disagreement with it on the merits, if there is a barely colorable justification for the outcome reached." Banco de Seguros del Estado v. Mutual Marine Office, Inc., 344 F.3d 255, 260 (2d Cir. 2003) (quoting Andros Compania Maritima, S.A. v. Marc Rich & Co., 579 F.2d 691, 704 (2d Cir. 1978)). Absent manifest prejudice or disregard for applicable law, "arbitrators are not required to provide an explanation for their decision" and a hypothetical rational basis is sufficient. United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 598 (1960).

The Federal Arbitration Act ("FAA"), 9 U.S.C. §10(a), provides four grounds for vacatur, the fourth of which Local 891 relies upon here. It requires a court to vacate an award "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final and definite award upon the subject matter submitted was not made…" Id. In essence, because the Arbitrator went beyond the New Hire Rate provision, and construed a provision that, according to Local 891, neither party had raised nor which, in

Local 891's view, bore on the issue of whether Thomas should be considered a new hire, the Arbitrator exceeded his authority.

Local 891's primary argument is that the Arbitrator simply ignored the plain language of the New Hire Rate provision. It points out the absence of any dispute that Thomas had "not worked any hours during the previous six month period," and that he therefore fell squarely within the provision. It further notes that the New Hire Rate provision had an express exception to its terms – fireperson – thus showing that when the parties wanted to exclude a particular group of custodian workers, they knew how to do it and did it expressly. It also notes that Article 25(b) post-dated the New Hire Rate provision, the former being added during the last round of contract negotiations, while the New Hire Rate provision had been in many predecessor contracts, and thus it has no bearing on how the New Hire Rate provision should be construed.

Local 891's argument is compelling and might be dispositive if this Court was ruling on a clean slate. But it is not, and the argument is not sufficient to overcome the deferential standard of review afforded arbitration awards.

In considering whether an arbitrator has exceeded his authority, the court "focuses on whether the arbitrators had the power based on the parties' submissions or the arbitration agreement, to reach a certain issue, not whether the arbitrators correctly decided that issue." Westerbeke Corp. v. Daihatsu Motor Co., Ltd., 304 F.3d 200, 220 (2d Cir. 2002) (quoting DiRussa v. Dean Witter Reynolds Inc., 121 F.3d 818, 824 (2d Cir. 1997)). Arbitration is limited in that "a party cannot be forced to arbitrate any dispute that it has not obligated itself, by contract, to submit to arbitration." United Steelworkers v. Mead Corp., 21 F.3d 128, 131 (6th Cir. 1994). Therefore, an arbitrator's

7

authority may be limited by the language that grants that authority, which in this case is the CBA. An arbitrator's authority to issue awards is also limited to the issues submitted. See 187 Concourse Assocs. v. Fishman, 399 F.3d 524, 527 (2d Cir. 2005).

The arbitrator was given authority by Section 18 of the CBA, which states that "[a]ll disputes arising between the parties" and "[a]ny grievance or claim or charge that any provision of this Agreement has been violated ... shall constitute an arbitrable dispute hereunder" and the "decision of such arbitrator shall be final and binding upon the parties." The CBA does not include language expressly limiting the arbitrator's authority, which sometimes appears in collective bargaining agreements, such as "the arbitrator shall have no authority to add to, subtract from, or modify the provisions of this Agreement and shall confine his decision to a determination based on the facts presented." 187 Concourse Assocs., 399 F.3d at 526. Many of the cases which the plaintiffs rely on include such limiting language. See Id.; accord Dist. No. 72 & Local Lodge 1127, Int'l Ass'n of Mach. & Aerospace Workers v. Teter Tool & Die, Inc., 630 F.Supp. 732, 734 (N.D. Ind. 1986) ("limits on the arbitrator's authority were that he could not add to, subtract from, modify, change, or alter any of the agreement's provisions"); Harry Hoffman Printing, Inc. v. Graphic Commuc'ns Int'l Union, Local 261, 950 F.2d 95, 100 (2d Cir. 1991) ("Nothing in this contract shall be construed as requiring either party hereto to do or refrain from doing anything not explicitly and expressly set forth in this contract" and "[n]either the grievance procedure nor the arbitration shall add to, alter, amend, modify, or subtract from the provisions of this agreement"). Section 18 of the CBA does not limit the methods an arbitrator may use in reaching his decision, so the arbitrator is allowed wide discretion in his reasoning.

It must be remembered that the issue before the Arbitrator was not the proper interpretation of the New Hire Rate provision – the parties were unable to agree on the statement of the issue in that manner or any other. This left the Arbitrator free to frame the issue as he saw fit, and to paraphrase his statement of the issue, he essentially proceeded to determine what Thomas' rate of pay should be under the CBA – the entire CBA. Nothing in the arbitration agreement and no stipulation of the parties prevented him from viewing the issue that way; it certainly did capture the essence of the parties' dispute.

Once the Arbitrator took that perspective on the issue, it is easy enough to see how he reached his result, whether one agrees with it or not. There is at least an arguable inconsistency between the New Hire Rate qualifying term – "not worked any hours during [the] previous six month period" -- and Article 25(b)'s qualifying term that someone who "incurred a break in service for more than thirty (30) consecutive calendar days ... *shall be deemed a new employee for all purposes*" (emphasis added), triggering the need to determine whether Thomas had a "break in service." This the Arbitrator proceeded to do and found that there was no break in service, and thus Thomas was not to be considered a "new employee," nor qualify as a "new" hire under the New Hire Rate provision. Although he did not reject the New Hire Rate provision expressly, nothing required him to do that. It is necessarily implied in the Award.

The Award was permeated with references to the term "new hire" and the Award makes apparent the Arbitrator's awareness that a pay cut under the New Hire Rate provision was at stake. He was thus looking squarely at the New Hire Rate provision.

9

He did not refer expressly to the provision simply because he found he found that Article 25(b) supplied the more accurate answer to the question.

Indeed, Local 891's assertion that Article 25(b) was added after the New Hire Rate provision cuts just as easily against it. With full knowledge of the New Hire Rate provision, the negotiators proceeded to add another provision that defined who would be a new hire "for all purposes." Moreover, the presence of the New Hire Rate provision in a mere appendix, as opposed to Article 25(b)'s inclusion as a substantive term of the CBA, could be argued to give the latter more force.[1]

Local 891 argues that the New Hire Rate provision clearly applies to wages and Article 25(b) just as clearly applies only to benefits, and this may indeed be the more persuasive view. But the inclusion of the language "shall be deemed a new employee *for all purposes*" (emphasis added) in Article 25(b) is sufficient to create an arbitrable issue that, once determined either way, is not subject to vacatur under §10(a)(4) of the FAA.

Finally, plaintiffs argue that the Arbitrator failed to make a ruling based on the language of the CBA presented and instead exceeded his authority by inserting his own opinions of equity and "industrial justice" in making his ruling. They argue that the

---

[1] I note that there is something peculiar about Local 891's insistence that Article 25(b) was never mentioned during the arbitration. The Award notes that Article 25(b) "was added to the Collective Bargaining Agreement during the negotiations resulting in the current Collective [B]argaining Agreement," and it is not clear how the Arbitrator would have known that if neither party mentioned Article 25(b) as having some bearing on the issue before him. Moreover, although Local 891 acknowledges that the parties were unable to agree on a joint statement of the issue, it does not explain why. If the issue was simply whether the New Hire Rate provision applied to Thomas, it seems it would have been easy enough to state.

As noted above, defendant here, Local 32BJ, did not act for the grievant during the arbitration and has no first hand knowledge of what happened there; the respondent was its predecessor, Local 74. This suggests at least the possibility that some things happened in the arbitration that are not part of the record before me, and perhaps might be characterized differently than Local 891 has presented them. However, this possibility has not influenced the decision I have reached here, as I must rule on the record as it exists, and Local 32BJ has determined not to dispute the facts as characterized by Local 891.

concept of "reasons" behind a firing was not included the CBA and the concept is foreign to the agreement between the parties.

In determining whether to vacate an arbitration award, a court "must determine 'whether the arbitrator[s] acted within the scope of [their] authority,' or whether the arbitral award is merely the 'arbitrator[s'] own brand of justice.'" Banco de Seguros del Estado, 344 F.3d at 262 (quoting Local 1199, Drug, Hosp. and Health Care Employees Union v. Brooks Drug Co., 956 F.2d 22, 25 (2d Cir. 1992)). An award is merely "an example of the arbitrator's own brand of justice" if it does not draw its "essence from the agreement." Id. However, "[a]s long as a plausible solution is available within the general framework of the agreement, the arbitrator has the authority to decide what the parties would have agreed on had they foreseen the particular item in dispute... [i]n such cases, judicial review is limited to whether the arbitrator's solution can be rationally derived from some plausible theory of the general framework or intent of the agreement." Desert Palace, Inc. v. Local Joint Executive Bd., 679 F.2d 789, 793 (9th Cir. 1982). If the contract is ambiguous, an arbitrator has greater authority to interpret the agreement. See Sears, Roebuck & Co. v. Teamsters Local Union No. 243, 683 F.2d 154, 155 (6th Cir. 1982).

Here, the Arbitrator considered analogies like USERRA and the FMLA, amongst other laws, in making his decision. Plaintiffs claim that this is a form of "industrial justice" because the Arbitrator was supposed to make a decision based solely on the text of the CBA, without relying on his own policy decisions and independent statutory language unrelated to the CBA. However, the Arbitrator was merely applying familiar principles of contractual interpretation. His ruling could "be read as embodying a

construction of the agreement itself... with the arbitrator looking to 'the law' for help in determining the sense of the agreement" and therefore, it still drew its "essence from the agreement." United Steelworkers of America, 363 U.S. at 597. The Arbitrator was not incorporating the principle of "cause for termination" into the CBA without grounds to do so. He was applying a common example of "break in service" because the meaning was not provided in the agreement.

The Award thus passes the broad standard of review as providing at least "a barely colorable justification for the outcome reached." Banco de Seguros del Estado, 344 F.3d at 260 (quoting Andros Compania Maritima, S.A., 579 F.2d at 704). It must be confirmed.

## CONCLUSION

Plaintiffs' petition and motion to confirm the Award is denied. Defendants' motion is granted. The Court will enter a separate judgment confirming the Award.

**SO ORDERED.**

/s/(BMC)

———————————
U.S.D.J.

Dated: Brooklyn, New York
September 24, 2007